UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| GRANT H. HUNTER,<br><br>   *Plaintiff*,<br><br>v.<br><br>MARCO RUBIO,<br><br>   *Defendant*. | Civil Action No. 24-480 (TJK) |

### MEMORANDUM OPINION

  Grant Hunter, a former foreign service officer at the Department of State, sued under Title VII, alleging that his employer unlawfully discriminated and retaliated against him. The Department moves to dismiss all claims. The Court agrees that Hunter has either failed to state a claim for relief or failed to exhaust his administrative remedies as to each, so it will grant the Department's motion and dismiss both the operative complaint—his third at this point—and the case.

**I. Background**

  Hunter alleges that he is a gay, non-binary, light-skinned African American who worked at the Department of State ("the Department") from 2013 to 2024. ECF No. 36 ¶¶ 10, 42. There, he "maintained satisfactory performance rankings and received multiple awards." *Id.* ¶ 10. From 2014 to 2016, he says he engaged in a sexual relationship with his direct supervisor, which was "explicitly prohibit[ed]" by Department policy. *Id.* ¶¶ 15, 25. He reported this relationship internally in 2021 and 2024. *Id.* ¶¶ 16, 24. But to his knowledge, the Department never investigated the relationship. *Id.* ¶ 26.

  While there, and "particularly after his first and second assignments," Hunter alleges that his supervisors "systematically isolated [him] from other officers at the same grade/rank." ECF

No. 36 ¶ 20. According to Hunter, this isolation took the form of "[e]xcluding him from substantive meetings . . . while allowing similarly situated colleagues to attend," "[r]emoving him from work-related email chains," "[a]ssigning him to 'Overcomplement' status for extended periods beginning in late 2020," "[f]ailing to provide him with complete work requirements statements," "[p]lacing him around senior supervisory officers who consistently assigned him duties outside his work requirements," "[d]enying him opportunities to participate in substantive diplomatic work," and overall "[c]reating a work environment where he was systematically excluded from regular office communications and activities." *Id.*

Hunter alleges that his supervisors sent emails "referencing his tone and behavior using coded language that is often disproportionately applied to male employees of color." ECF No. 36 ¶ 37. Once, at an unspecified time during his tenure at the Department, a departing colleague sent "what [Hunter] believed to be a racist email" to Hunter's supervisor. *Id.* ¶ 17. The email compared Hunter to "Iraqis in western Iraq when we were occupying their country in 2004–05." *Id.* Overall, Hunter alleges that he was treated differently than similarly situated peers who were female, straight, white, or darker-skinned African Americans. *Id.* ¶¶ 31–33, 45, 47. His supervisors' failure to adequately respond to Hunter's reports of harassment and their systematic isolation of him from his peers also created a hostile work environment, Hunter claims. *Id.* ¶¶ 65–67.

Hunter alleges that in May 2023 he contacted an EEO counselor to complain of race-based discrimination. ECF No. 36 ¶ 18. He submitted an internal complaint against one of his coworkers for harassment around the same time. *Id.* ¶ 19. That same month, the Department placed Hunter on paid administrative leave. *Id.* ¶ 21. In November 2023, while still on leave, Hunter received "a proposed separation for cause and low rankings from promotion boards." *Id.* ¶ 28. He remained on paid administrative leave through at least January 2024, but in February the Department

2

"pressured [Hunter] to withdraw his discrimination claims in exchange for resignation." *Id.* ¶¶ 22, 39. These conditions allegedly "forced [his] resignation," and Hunter ultimately resigned "under duress" in late February 2024. *Id.* ¶¶ 41–42.

Hunter sued that same month—in February 2024—and amended his complaint soon after. ECF Nos. 1, 3. He failed to properly serve the Department until November. ECF No. 19; *see also* Minute Order of Oct. 25, 2024 (vacating Clerk's entry of Default after the Department's filing of a Notice of Non-Service). The Department moved to dismiss in February 2025. ECF No. 21. A week later, Hunter moved for leave to file a second amended complaint, ECF No. 31, which the Court granted, Minute Order of March 19, 2025. A week after *that*, Hunter asked the Court for leave to amend his complaint again, ECF No. 35, which the Court again granted, Minute Order of March 27, 2025. The Department moves to dismiss all claims in the Third Amended Complaint under Rule 12(b)(6). ECF No. 45.

**II.     Legal Standard**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A plaintiff states a facially plausible claim when he pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true "all well-pleaded factual allegations" and "construes reasonable inferences from those allegations in the plaintiff's favor." *Sissel v. HHS*, 760 F.3d 1, 4 (D.C. Cir. 2014). But "mere conclusory statements" are not enough to establish a plausible claim, and courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 555).

Although Hunter was represented when he filed the operative complaint, he now proceeds pro se. ECF No. 48 at 1. The Court must thus construe his pro se filings liberally. *See Bowman*

3

*v. Iddon*, 848 F.3d 1034, 1039 (D.C. Cir. 2017) (citation omitted). This does not absolve him of the need to plead facts that plausibly establish a claim for relief. *See Bickford v. United States*, 808 F. Supp. 2d 175, 179–80 (D.D.C. 2011). At this stage in the proceedings, and because Hunter proceeds pro se, the Court considers the factual allegations from all his filings, not just his operative complaint.[1] *Brown v. Whole Foods Mkt. Grp., Inc.*, 789 F.3d 146, 152 (D.C. Cir. 2015).

**III.    Analysis**

Hunter brings six Title VII claims against the Department for race, color, and gender discrimination and retaliation in the Third Amended Complaint. *See* ECF No. 36; 42 U.S.C. § 2000e-2(a)(1). More specifically, he asserts discriminatory treatment based on race, sex, and color (Counts I, III, and V); retaliation (Count II), creation of a hostile work environment based on sex (Count IV); and constructive discharge (Count VI). *Id.* As explained below, Hunter's first five claims all fail to state a claim on which relief can be granted, so the Court will dismiss them. And Hunter has failed to exhaust administrative remedies for his constructive discharge claim, so that claim must be dismissed as well.

**A.    Discriminatory Treatment**

Title VII makes it unlawful for any employer "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). To prevail on a claim of discrimination under Title VII, a plaintiff must show "(1) []he is a member of a protected class; (2) []he suffered an adverse employment action; and (3) the unfavorable action gives rise to

---

[1] For this reason, the Court considers Hunter's allegations in his opposition to the Department's motion to dismiss, ECF No. 48. It also considers the EEOC complaints and relevant communications attached to the Department's motion to dismiss, of which it may take judicial notice. *See Kaempe v. Myers*, 367 F.3d 958, 965 (D.C. Cir. 2004); *Turner v. Buttigieg*, No. 23-cv-1665 (LLA), 2024 WL 4346332, at *4 (D.D.C. Sept. 30, 2024).

an inference of discrimination." *Wiley v. Glassman*, 511 F.3d 151, 155 (D.C. Cir. 2007) (quoting *Brown v. Brody*, 199 F.3d 446, 452 (D.C. Cir. 1999)). At the motion-to-dismiss stage, "'an employment discrimination plaintiff is not required to plead every fact necessary to establish a prima facie case," *Jones v. Air Line Pilots Ass'n, Int'l*, 642 F.3d 1100, 1104 (D.C. Cir. 2011), but he must still "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged," *Harris v. D.C. Water & Sewer Auth.*, 791 F.3d 65, 68 (D.C. Cir. 2015) (quoting *Iqbal*, 556 U.S. at 678). That content includes information "sufficient to support an inference of discriminatory motivation." *Shanks v. Int'l Union of Bricklayers & Allied Craftworkers*, 134 F.4th 585, 596 (D.C. Cir. 2025).

### 1.     Race and Color Discrimination (Counts I and V)

Hunter alleges that he was discriminated against based on his race and his color as a lighter-skinned African American. ECF No. 36 ¶ 69. "[C]olor is usually mixed with or subordinate to race discrimination," so the Court considers Hunter's two claims together. *Daughtry v. kmG Hauling, Inc.*, No. 20-cv-3361 (TJK), 2021 WL 4078686, at *5 (D.D.C. Sept. 8, 2021); *see Gordon v. Off. of Architect of the Capitol*, 750 F. Supp. 2d 82, 88 n.3 (D.D.C. 2010) (construing claims of race and color discrimination as "identical").

The Court assumes without deciding that Hunter has sufficiently pleaded that he suffered an adverse employment action through his allegations that his supervisors purposefully isolated him from his colleagues, treated him poorly, gave him poor reviews, and ultimately placed him on administrative leave. *See* ECF No. 36 ¶¶ 53–54, 58–63, 68–69. Adverse employment actions must involve "some harm respecting an identifiable term or condition of employment."[2] *Muldrow*

---

[2] In *Muldrow*, the Supreme Court clarified the D.C. Circuit's en banc decision in *Chambers*, which held that, under Title VII, a plaintiff need not allege that an adverse employment action

*v. City of St. Louis, Missouri*, 601 U.S. 346, 347 (2024).  The Court assumes that at least some of this conduct—especially being placed on administrative leave—is actionable under *Muldrow* if it is motivated by unlawful discrimination.³  *See Hollingsworth v. Vilsack*, No. 23-cv-2427 (LLA), 2024 WL 4332118, at *9 (D.D.C. Sept. 27, 2024).

The problem is that Hunter has failed to plead facts that support a plausible inference that he suffered an adverse action "because of" his race or color.  *Massaquoi v. District of Columbia*, 81 F. Supp. 3d 44, 49 (D.D.C. 2015).  His sole allegation along these lines is that his supervisors sent emails about him that "us[ed] coded language that is often disproportionately applied to male employees of color."  ECF No. 36 ¶ 37.  But this stray allegation alone, which does not even identify the language at issue, does not support a reasonable inference that any adverse employment action imposed on Hunter was motivated by his race or color.⁴

---

caused an "objectively tangible harm"; instead, a plaintiff must show discrimination with respect to an employee's "terms, conditions, or privileges of employment."  *Chambers v. District of Columbia*, 3 F.4th 870, 872, 874–75 (D.C. Cir. 2022) (quoting 42 U.S.C. 2000e–2(a)(1)).

³ The Department urges the Court to find that the harm standard set out by the Supreme Court in *Muldrow* applies only to Title VII claims against non-federal employers.  ECF No. 45-1 at 21–23.  In doing so, it relies on *Babb v. Wilkie*, which held that the Age Discrimination in Employment Act's ("ADEA") federal- and non-federal provisions set distinct standards.  589 U.S. 449, 410 (2020).  Because the difference in federal and non-federal provisions of the ADEA "are almost identical to those found in Title VII," the Department argues that the Court should judge Hunter's adverse impact based on a stricter standard than the one set out in *Muldrow*.  ECF No. 45-1 at 22.  The Court assumes, again without deciding, that *Babb* does not require different standards for federal and non-federal Title VII claims.  *See, e.g.*, *Phelan v. Noem*, No. 24-cv-939 (LLA), 2025 WL 2732749, at *7 (D.D.C. Sept. 29, 2025) (finding that *Muldrow* applies to both federal and non-federal employee Title VII claims); *Rhone v. Rubio*, No. 24-cv-3389 (RC), 2025 WL 3017791, at *4 (D.D.C. Oct. 28, 2025) (same).

⁴ Hunter also alleges that a departing coworker sent an email that reflected discrimination by comparing his facial expressions to "Iraqis in western Iraq when we were occupying their country in 2004–05."  ECF No. 36 ¶ 17.  But this does not plead causation either.  For one thing, Hunter must plausibly allege facts that support an inference of discrimination by his *supervisors*, not a fellow employee.  And for another, the Court does not construe the email, in context, to support an inference of race-based discrimination at all, even by the coworker who sent it.  The phrase at

6

Hunter also alleges that both "white" *and* "darker-skinned" African American colleagues were treated more favorably than him. ECF No. 36 ¶¶ 31–33. But to support a discrimination claim this way, Hunter needed to "plead sufficient facts to raise a plausible inference that *all of the relevant aspects* of his employment situation were *nearly identical* to those of the other employees who did not suffer similar adverse employment actions." *Jones v. Ass'n of Am. Med. Colls.*, No. 22-cv-1680 (EGS), 2023 WL 2327901, at *11 (D.D.C. Mar. 2, 2023) (emphases added) (citation omitted). On this front, Hunter again offers only conclusory allegations about his "white" and "darker-skinned" co-workers. The Third Amended Complaint lacks any "factual allegations describing . . . how they were similarly situated"—nothing "about their . . . experiences, levels of seniority," precise race, *id.*, their "responsibilities compared to [his]," or whether they "reported to the same supervisors," *Yuvienco v. Vilsack*, No. 23-cv-186 (RC), 2024 WL 727712, at *4 (D.D.C. Feb. 22, 2024).

In the end, Hunter all but admits that he is grasping at straws with respect to these claims: he argues that an "inference of discrimination [is warranted] because there is nothing else that [he] can think of that warranted [his] treatment." ECF No. 48 at 3. But Hunter needs more than that to allege a claim for race- or color- based discrimination.

### 2. Sex Discrimination (Count III)

Hunter also asserts that he was discriminated against because of his sex because he identifies as gay and non-binary. ECF No. 36 ¶ 59. Specifically, he alleges that the Department

---

issue appears in a bulleted paragraph that discusses Hunter's "incredibly rude" "demeanor," and tendency to "glare" at coworkers without exchanging pleasantries. ECF No. 45-5. The coworker stated, "On the times that he glares at me, the only word I can think to describe it is 'malice'—it's the sort of look I'd seen on the faces of Iraqis in western Iraq when we were occupying their country in 2004–05." *Id.*

discriminated against him by "fail[ing] to investigate a reported sexual relationship between [him] and his direct supervisor." *Id.* ¶ 60.  He also alleges that his supervisors discriminated against him by "assigning him disproportionately to administrative duties, treating his interpersonal conduct more harshly than that of similarly situated female employees, and excluding him from key meetings and projects while female colleagues were included." *Id.* ¶ 62.  But as with Hunter's race and color discrimination claims, Hunter's sex discrimination claim fails because he has not plausibly alleged causation.

      The Court again assumes that Hunter has plausibly alleged he suffered an adverse action, even though he does not allege that the Department placed him on administrative leave due to sex discrimination.  But this claim still fails, because his allegations do not support a plausible inference that he suffered an adverse employment action because of his sex.  Hunter's only allegation purportedly linking these actions to alleged sex discrimination is his assertion that the Department failed to investigate his sexual relationship with a direct supervisor.  ECF No. 36 ¶ 60.  But he does not allege or explain why such a failure should give rise to an inference of sex-based discrimination, or even how that failure connects to any specific adverse action.  Otherwise, the Third Amended Complaint contains only passing references to sex discrimination that are unsupported by factual allegations.  *See* ECF No. 36 ¶ 62.  Such "threadbare" and "conclusory allegations of discrimination" do not get Hunter past the motion-to-dismiss stage.  *Montgomery v. Mayorkas*, Nos. 23-cv-3931, 24-cv-1697 (BAH), 2024 WL 4973406, at *7 (D.D.C. Dec. 4, 2024) (citation omitted).  Hunter also claims that other female and straight male colleagues were treated more favorably than him.  ECF No. 36 ¶¶ 62–63.  But, again, he does not plead facts about these other

employees sufficient to support an inference of sex-based discrimination, or really, any facts about these coworkers at all.[5]

## B.  Retaliation (Count II)

Title VII's anti-retaliation provision forbids an employer from "discriminat[ing] against [an] employee[] . . . because he has opposed any practice" outlawed by Title VII or because he "has made a charge, testified, assisted, or participated in a Title VII proceeding." 42 U.S.C. § 2000e-3(a).  To state a claim of retaliation under Title VII and avoid dismissal, a plaintiff must plead facts to plausibly allow the Court to infer that "(1) he engaged in a statutorily protected activity; (2) he suffered a materially adverse action by his employer; and (3) a causal connection existed between the two." *Wiley*, 511 F.3d at 155; *see Poole v. U.S. Gov. Publ'g Off.*, 219 F. Supp. 3d 80, 84 (D.D.C. 2016).

To begin, no one doubts that Hunter has adequately alleged that he engaged in statutorily protected activity by lodging internal complaints and speaking to an EEOC counselor.  *See* ECF No. 36 ¶¶ 3, 56.  The Department only questions whether he has adequately pleaded a materially adverse action and a causal connection between the two.

In the retaliation context, such an action is one that "might have 'dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *Burlington N. & Santa Fe. R.R.*

---

[5] The Department also raises the affirmative defense that Hunter has failed to exhaust his administrative remedies for his sex discrimination claim. ECF No. 45-1 at 15.  But Hunter alleges that he sent an EEO counselor an email in February 2024 "expressing [his] wish to include gender identify and sexual orientation as bases for [his] discrimination complaint." ECF No. 48 at 2, 8–9.  And while he admits he does not know what happened afterward, Hunter argues that his email gave the Department "sufficient notice to investigate the additional bases of gender identity and sexual orientation" discrimination. *Id.* at 2.  The Court finds it likely that, at least at this stage, Hunter's allegations are enough to overcome an exhaustion defense.  Still, because Hunter has not plausibly alleged sex discrimination for the reasons described above, the Court need not address this affirmative defense.

*Co. v. White*, 548 U.S. 53, 68 (2006) (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)). At the same time, Title VII protects individuals "not from all retaliation, but from retaliation that produces an injury or harm." *Id.* at 67. Thus, the D.C. Circuit has specified that work-related retaliation must have "tangible job consequences" to qualify as materially adverse. *See Taylor v. Solis*, 571 F.3d 1313, 1321 (D.C. Cir. 2009) (citation omitted); *Bridgeforth v. Jewell*, 721 F.3d 661, 663 (D.C. Cir. 2013) (defining materially adverse actions as those that demonstrate objectively tangible harm).

Hunter alleges that in retaliation, the Department placed him on extended administrative leave, proposed he be separated for cause, and its promotion boards gave him low rankings. ECF No. 36 ¶ 56. The Court agrees with the Department that he does not plead facts from which the Court can infer that he suffered "tangible job consequences" from any of these events such that they are materially adverse. First, as for his placement on administrative leave, the Department argues such an action is not materially adverse, seemingly as a matter of law, citing *Hornsby v. Watt,* 217 F. Supp. 3d 58, 65 (D.D.C. 2016) and *Hockaday v. WMATA*, No. 21-cv-3265 (TNM), 2023 WL 3844388, at *8, (D.D.C. June 3, 2026). ECF No. 45-1 at 31. Even assuming that "penalizing an employee by placement on administrative leave *may* amount to an adverse action in the retaliation context," *Wesley v. Georgetown Univ.*, No. 18-cv-1539 (BAH), 2018 WL 5777396, at *6 (D.D.C. Nov. 2, 2018) (emphasis added), Hunter has still failed to allege "facts demonstrating that receiving paid administrative leave . . . resulted in tangible, objective harm" to him, *id.* at *7.

Second, Hunter does not, and could not, allege any tangible consequences flowing from any proposal from the Department that he be separated for cause, because he does not allege that proposed action ever happened.

Third, with respect to his allegation that its promotion boards gave him low rankings, again, Hunter does not allege that any "tangible job consequences" resulted. *Baloch v. Kempthorne*, 550 F.3d 1191, 1199 (D.C. Cir. 2008) (citation omitted). He does not, for example, allege that the promotion board rankings created any "financial harms" for him, or that they "affect[ed] his position, grade level, salary or promotion opportunities." *Id.* Moreover, he has not cleared the bar to allege causation for this instance of alleged retaliation. Hunter made his EEO and harassment complaints in May 2023 but did not receive low promotion board rankings until November that year. ECF No. 36 ¶¶ 21, 28. And a six-month lapse between a protected activity and an adverse action is too long to support an inference of causation for a retaliation claim. *See Pueschel v. Chao*, 955 F.3d 163, 166–67 (D.C. Cir. 2020); *Furey v. Mnuchin*, 334 F. Supp. 3d 148, 167 (D.D.C. 2018).

    **C.**     **Hostile Work Environment (Count IV)**

"[A] plaintiff may establish a violation of Title VII by proving that discrimination . . . has created a hostile or abusive work environment." *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 66 (1986). To state a hostile work environment claim, a plaintiff must plausibly allege facts that, if true, would support a reasonable inference that misconduct occurred that was so severe that it changed "a 'term, condition, or privilege' of employment within the meaning of Title VII." *Id.* at 67; *see also Moore v. Castro*, 192 F. Supp. 3d 18, 46 (D.D.C. 2016). In determining whether a work environment is hostile, courts consider "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993). "[T]he ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing" are not serious enough to create a hostile work environment. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998)

11

(quoting Barbara Lindemann & David Kadue, *Sexual Harassment in Employment Law* 175 (1992)).

Hunter alleges that he was subject to a hostile work environment based on his "sexual orientation" and "gender identity." ECF No. 36 ¶ 65. This claim fails because has not alleged facts that support a reasonable inference that he was subjected to discriminatory treatment severe enough to qualify as a hostile work environment. He alleges that the Department "systemically isolated [him] from other officers at the same grade/rank," *id.* ¶ 67, including by "relegat[ing] him to administrative tasks," *id.* ¶ 32, "exclud[ing] [him] from planning meetings" and "deny[ing] [him] key portfolio responsibilities," *id.* ¶ 36. He also alleges that the Department "placed him around senior supervisory officers who abused their authority over him," *id.* ¶ 67, by "assign[ing] him duties outside his work requirements, rather than allowing him to work alongside peers at his grade level," *id.* ¶ 20. And ultimately, the Department placed him on administrative leave. *Id.* ¶ 66. But these allegations do not come close to plausibly alleging that Hunter was subject to the type of severe and pervasive discrimination based on sexual orientation and gender identity that may amount to a hostile work environment.

### D. Constructive Discharge (Count VI)

Ordinarily, voluntary employment decisions cannot give rise to claims of discrimination under Title VII. *See Penn. State Police v. Suders*, 542 U.S. 129, 141 (2004). But when a plaintiff resigns due to the creation of "unendurable working conditions," he can rely on the constructive discharge doctrine to assimilate his decision to resign "to a formal discharge for remedial purposes." *Id.* Hunter claims that the Department "deliberately created intolerable working conditions, including a prolonged administrative leave and pressure to resign." ECF No. 36 ¶ 71. These conditions, he alleges, "would compel any reasonable person to resign." *Id.* Hunter's resignation, he claims, "was not voluntary but was a constructive discharge." *Id.* ¶ 72.

Hunter's constructive discharge claim fails because the Department has shown that Hunter failed to his exhaust administrative remedies for it. Title VII requires that a plaintiff must exhaust administrative remedies by "timely filing a charge with the EEOC or a state agency" before seeking recourse in court. *Jones v. District of Columbia*, 273 F. Supp. 2d 61, 64 (D.D.C. 2003); *see* 42 U.S.C. § 2000e-16(c). A plaintiff must also have received from the EEOC "a 'right to sue' letter." *Jones*, 273 F. Supp. 2d at 64. Furthermore, a plaintiff may only bring a Title VII lawsuit raising those claims which they have raised in an EEOC complaint—or claims that are "like or reasonably related" to such claims. *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995) (citation omitted). The requirement to file an EEOC claim "serves the important purposes of giving the charged party notice of the claim and 'narrow[ing] the issues for prompt adjudication and decision.'" *Id.* (quoting *Laffey v. Nw. Airlines, Inc.*, 721 F.2d 429, 472 n.325 (D.C. Cir. 1976)).

Exhaustion is an affirmative defense that the defendant "bears the burden of pleading and proving." *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997). Once the defendant has met its burden, the plaintiff then "bears the burden of pleading and proving facts supporting equitable avoidance of the defense." *Id.* Failure to exhaust remedies amounts to a failure to state a claim under Rule 12(b)(6). *Hicklin v. McDonald*, 110 F. Supp. 3d 16, 18 (D.D.C. 2015).

The Department argues that Hunter's EEO complaint makes no mention of constructive discharge, which makes sense—the Department says—because Hunter filed it several months before Hunter alleges that he was constructively discharged in February 2024. ECF No. 45-1 at 15; ECF No. 36 ¶¶ 18, 42. And afterward, the Department argues, Hunter "did not amend his EEO complaint to include such a claim." ECF No. 45-1 at 15. In response, Hunter argues only that he "would not have had reasonable opportunity to specifically add the constructive discharge claim" because the agency had concluded its investigation by the date of his resignation, which he now

claims—unlike what he said in Third Amended Complaint—was August 1, 2024. ECF No. 48 at 2. Even if that were so, nothing stopped Hunter from filing a new EEO complaint after the alleged constructive discharge but before seeking judicial review. Thus, he has failed to exhaust his administrative remedies with respect to his constructive discharge claim.

## IV.    Conclusion

For all the above reasons, the Court will grant Defendant's motion and dismiss the Third Amended Complaint and the case. A separate order will issue.

/s/ Timothy J. Kelly
TIMOTHY J. KELLY
United States District Judge

Date: February 23, 2026